Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL VI

| | | |
|---|---|---|
| KINDRED SPIRITS, INC.<br><br>Recurrida<br><br>V.<br><br>RANDIEL JOSÉ NEGRÓN TORRES<br><br>Peticionario | KLCE202400048 | *CERTIORARI* procedente del Tribunal de Primera Instancia, Sala Superior de Bayamón<br><br>Caso Núm.: SJ2023CV05737 (501)<br><br>Sobre: Libelo, Calumnia o Difamación |

Panel integrado por su presidenta la jueza Ortiz Flores, el juez Rivera Torres, la jueza Rivera Pérez y el juez Campos Pérez

**Rivera Torres, Juez Ponente**

**SENTENCIA**

En San Juan, Puerto Rico, a 21 de febrero de 2024.

Comparece ante este tribunal apelativo el Sr. Randiel José Negrón Torres (señor Negrón Torres o peticionario) mediante *Petición de Certiorari* solicitándonos que revoquemos la *Resolución* emitida por el Tribunal de Primera Instancia, Sala Superior de Bayamón (TPI), el 12 de diciembre de 2023, notificada al día siguiente. Mediante este dictamen, el foro primario declaró, entre otros asuntos, *No Ha Lugar* a la moción de desestimación instada por el peticionario al amparo de la Regla 10.2 de las Reglas de Procedimiento Civil, 32 LPRA Ap. V, R. 10.2.

Por los fundamentos que expondremos a continuación, expedimos el auto de *certiorari* solicitado y revocamos la *Resolución* recurrida. En consecuencia, procede desestimar la demanda instada en contra del peticionario.

**I.**

El 14 de junio de 2023 Kindred Spirits, Inc.*,* una corporación doméstica, dueña y operadora del restaurante Bottles (KSI, Bottles

Número Identificador

SEN2024_____

o recurrida), instó demanda sobre daños y perjuicios, libelo, calumnia y difamación en contra del peticionario. En síntesis, alegó que el señor Negrón Torres ha realizado, durante semanas, varias expresiones públicas a través de distintos medios y redes sociales sobre la contratación de meseros y meseras por parte de Bottles y la manera en que se les paga sus salarios. Arguyó que dichas manifestaciones son falsas, difamatorias, libelosas y fueron realizadas por el peticionario con grave menosprecio a la verdad para dañar la imagen y reputación del negocio. Enfatizó que, contrario a lo expresado por el peticionario, todos los meseros y meseras son empleados y no contratistas independientes; ningún mesero o mesera ha recibido una compensación menor al salario mínimo establecido por ley; y Bottles les entrega a ellos (as) la totalidad de la propina dejada por un cliente. Manifestó que, a consecuencia de dichas expresiones públicas, verbales y escritas, ha sufrido daños reales, así como a su imagen y reputación, estimados en $1,333,450. Asimismo, solicitó al TPI que imponga el pago de las costas, gastos y honorarios de abogado.

El 21 de agosto de 2023, el señor Negrón Torres presentó *Solicitud de Desestimación* en la que elaboró varios argumentos por lo que procede desestimar la causa de acción en su contra. Entre estos se encuentran que: el restaurante Bottles es una figura pública; las expresiones y declaraciones del peticionario están directamente vinculadas a las alegaciones contenidas en una Querella sobre impago de salarios, incoada en contra de la entidad, la cual depende de la adjudicación en el Tribunal Federal de Distrito de Puerto Rico, luego de que la recurrida la removiera a dicha jurisdicción; las expresiones y declaraciones del señor Negrón Torres al descansar exclusivamente en la susodicha Querella están protegidas por el privilegio del reporte justo y verdadero; la recurrida persigue castigar el ejercicio de la libre expresión por un portavoz de

la organización Justicia Salarial creada para promover discusión pública a favor del reconocimiento de los derechos de los (as) meseros (as); así como para denunciar prácticas violatorias de sus derechos; y la única declaración que no está comprendida en dicha Querella es una respecto a que la exigua compensación que reciben los (as) meseros (as) "es un legado directo de la esclavitud". No obstante, alegó que esta última manifestación no es falsa o difamatoria, sino que está cimentada en escritos académicos y cae dentro de los contornos de la defensa de hipérbole retórica empleada para acentuar un asunto de alto interés público. Por lo que, entiende que la demanda deja de exponer una reclamación que justifica la concesión de un remedio.

La recurrida se opuso en su escrito y expresó que el señor Negrón Torres utilizó el mecanismo desestimatorio de manera incorrecta al descansar en defensas afirmativas que no son susceptibles de ser resueltas en una moción de tal naturaleza. Respecto a lo argumentado por el peticionario ripostó lo siguiente: los hechos de la demanda no se relacionan con las alegaciones de la Querella y el motivo de la acción se basa en las expresiones que este hiciera en las redes sociales y en la prensa contra Bottles; el peticionario al pretender establecer que sus manifestaciones son meramente reseñas de la Querella está litigando el motivo de sus expresiones, lo cual es una evaluación de credibilidad no susceptible de aquilatar en una moción de desestimación; la alegación de que el señor Negrón Torres hizo las expresiones en calidad de portavoz de la organización Justicia Salarial no es un hecho que surja de la demanda, por lo que es uno nuevo para amortiguar el efecto de sus actos; el peticionario realizó la mayoría de sus declaraciones en sus cuentas personales; para que aplique la defensa de reporte justo y verdadero este debe pertenecer a un noticiero u organización mediática; tampoco dicho privilegio aplica ya que sus expresiones

son acusaciones y no un reporte de ciertas alegaciones en contra del negocio; la acusación de Bottles como esclavista no se puede interpretar como mera retórica cuando la misma es una conclusión que este llevó a cabo a raíz de hechos falsos; la expresión "es un legado directo de esclavitud" es susceptible de varias interpretaciones por lo que se configuraría una controversia de hechos; de la demanda no surge un solo hecho que demuestre que Bottles es una figura pública; y no ha sido temeraria al incoar la causa de acción debido a que todo negocio tiene un interés legítimo en proteger su reputación y buen nombre.

El señor Negrón Torres presentó una réplica a la oposición en la cual contestó los antedichos argumentos. En especial, recalcó lo siguiente: que sus expresiones eran una representación fidedigna de las alegaciones incluidas en la Querella; la alegación de que el señor Negrón Torres habló como portavoz de Justicia Salarial surge del acápite 12 de la demanda; el recurrido falló en citar una fuente jurídica vinculante que decrete que el privilegio del reporte justo y verdadero solo es extensivo a periodistas; no procede la acción de libelo al ser las expresiones privilegiadas por ser estas un reporte justo y verdadero y; que la referencia al uso simbólico de la figura de la esclavitud está cobijado bajo la doctrina de hipérbole retórica.

El 12 de diciembre de 2023, se celebró una vista argumentativa para discutir la moción de desestimación instada por el señor Negrón Torres a la que comparecieron las partes y sus respectivos representantes legales. De la lectura de la misma surge que se esbozaron los mismos planteamientos incluidos en los escritos anteriores. Escuchadas las partes, el TPI expresó que resolvería por escrito.

Así las cosas, el 12 de diciembre de 2023, notificada al día siguiente, el foro *a quo* mediante la *Resolución* recurrida, declaró *No Ha Lugar* a la moción de desestimación instada por el peticionario

sin fundamentar dicha determinación. A su vez, pautó la Conferencia Inicial y ordenó a las partes presentar en el término de treinta (30) la calendarización del descubrimiento de prueba.

Inconforme con la determinación, el peticionario acude ente este foro revisor mediante el recurso de *certiorari* de epígrafe imputándole al TPI haber incurrido en el siguiente error:

> ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL DECLARAR NO HA LUGAR LA SOLICICITUD DE DESESTIMACIÓN, PESE A QUE, TOMANDO COMO CIERTOS LOS HECHOS BIEN ALEGADOS EN LA DEMANDA, LAS EXPRESIONES ATRIBUIDAS AL SR. RANDIEL JOSÉ NEGRÓN TORRES ESTÁN PROTEGIDAS POR EL PRIVILEGIO DEL REPORTE JUSTO Y VERDADERO Y LA DOCTRINA DE HIPÉRBOLE RETÓRICA.

El 19 de enero de 2024, emitimos *Resolución* concediendo a la parte recurrida el término de diez (10) días para expresarse. Así, el 22 de enero de 2024, la parte recurrida sometió una *Moción de Prórroga* solicitándonos diez (10) días para presentar su posición. Este Tribunal emitió una *Resolución* concediéndole hasta el 5 de febrero de 2024 para expresarse. El 5 de febrero de 2024, compareció la recurrida. En síntesis, la parte recurrida reiteró los argumentos planteados anteriormente y, además, añadió que el recurso se había tornado académico debido a que el peticionario había sometido sus alegaciones responsivas y que el descubrimiento de prueba estaba por comenzar. Así pues, al haberse cumplido con lo ordenado, decretamos perfeccionado el recurso.

Analizados los escritos de las partes y el expediente apelativo, así como estudiado el derecho aplicable, procedemos a resolver.

**II.**

**El auto de *certiorari***

La Regla 52.1 de las de Procedimiento Civil, 32 LPRA Ap. V, R. 52, establece las instancias en que el recurso de *certiorari* será expedido y así revisar las resoluciones u órdenes interlocutorias dictadas por el Tribunal de Primera Instancia. Sin embargo, aún

cuando un asunto esté comprendido dentro de las materias que podemos revisar de conformidad con la Regla 52.1, *supra*, previo a ejercer debidamente nuestra facultad revisora es menester evaluar si, a la luz de los criterios enumerados en la Regla 40 de nuestro Reglamento, 4 LPRA Ap. XXII-B, R. 40, se justifica nuestra intervención, pues distinto al recurso de apelación, este tribunal posee discreción para expedir el auto el *certiorari. García v. Padró*, 165 DPR 324, 334 (1999). Por supuesto, esta discreción no opera en el vacío y en ausencia de parámetros que la dirija. *I G Builders et al. v. BBVAPR*, 185 DPR 307, 338 (2012); *Rivera Figueroa v. Joe's European Shop*, 183 DPR 580, 596 (2011).

Precisa recordar que la discreción ha sido definida como "una forma de razonabilidad aplicada al discernimiento judicial para llegar a una conclusión justiciera. (citas omitidas)". *SLG Zapata-Rivera v. J.F. Montalvo*, 189 DPR 414, 435 (2013). Así pues, se ha considerado que la discreción se nutre de un juicio racional cimentado en la razonabilidad y en un sentido llano de justicia y "no es función al antojo o voluntad de uno, sin tasa ni limitación alguna. (citas omitidas)." *Íd.* A estos efectos, la Regla 40 de nuestro Reglamento, *supra*, enmarca los criterios que debemos considerar al momento de determinar si procede que expidamos el auto discrecional *certiorari. I G Builders et al. v. BBVAPR*, supra. Dicha regla establece lo siguiente:

(A) Si el remedio y la disposición de la decisión recurrida, a diferencia de sus fundamentos, son contrarios a derecho.

(B) Si la situación de hechos planteada es la más indicada para el análisis del problema.

(C) Si ha mediado prejuicio, parcialidad o error craso y manifiesto en la apreciación de la prueba por el Tribunal de Primera Instancia.

(D) Si el asunto planteado exige consideración más detenida a la luz de los autos originales, los cuales deberán ser elevados, o de alegatos más elaborados.

(E) Si la etapa del procedimiento en que se presenta el caso es la más propicia para su consideración.

(F) Si la expedición del auto o de la orden de mostrar causa no causan un fraccionamiento indebido del pleito y una dilación indeseable en la solución final del litigio.

(G) Si la expedición del auto o de la orden de mostrar causa evita un fracaso de la justicia.

En síntesis, la precitada regla exige que, como foro apelativo, evaluemos si alguna de las circunstancias enumeradas anteriormente está presente en la petición de *certiorari*. De estar alguna presente, podemos ejercer nuestra discreción e intervenir con el dictamen recurrido. De lo contrario, estaremos impedidos de expedir el auto, y por lo tanto deberá prevalecer la determinación del foro recurrido. Además, es norma trillada que un tribunal apelativo no intervendrá con las determinaciones discrecionales de un tribunal sentenciador, a no ser que las decisiones emitidas por este último sean arbitrarias o en abuso de su discreción. *Pueblo v. Rivera Santiago,* 176 DPR 559, 581 (2009). También, los criterios antes transcritos sirven de guía para poder determinar, de manera sabia y prudente, si procede o no intervenir en el caso en la etapa del procedimiento en que se encuentra el caso. *Torres Martínez v. Torres Ghigliotty,* 175 DPR 83, 96-97 (2008).

**Moción de Desestimación al amparo de la Regla 10.2 de las de Procedimiento Civil**

Una persona contra quien se haya presentado una reclamación judicial puede solicitar su desestimación cuando, de la faz de las alegaciones de la demanda, surja que alguna defensa afirmativa puede derrotar la pretensión del demandante. *Conde Cruz v. Resto Rodríguez et al,* 205 DPR 1043, 1077-1078 (2020); *Trans-Oceanic Life Ins. v. Oracle Corp.,* 184 DPR 689, 701 (2012).

A tales efectos, la Regla 10.2 de las de Procedimiento Civil, 32 Ap. V, R. 10.2, dispone lo siguiente:

Toda defensa de hechos o de derecho contra una reclamación se expondrá en la alegación responsiva excepto que, a opción

de la parte que alega, las siguientes defensas pueden hacerse mediante una moción debidamente fundamentada:

(1) Falta de jurisdicción sobre la materia;

(2) Falta de jurisdicción sobre la persona;

(3) Insuficiencia del emplazamiento;

(4) Insuficiencia del diligenciamiento del emplazamiento;

(5) Dejar de exponer una reclamación que justifique la concesión de un remedio;

(6) Dejar de acumular una parte indispensable;

[...] Si en una moción en que se formula la defensa (5) se exponen materias no contenidas en la alegación impugnada, y éstas no son excluidas por el tribunal, la moción deberá ser considerada como una solicitud de sentencia sumaria y estará sujeta a todos los trámites ulteriores provistos en la Regla 36 hasta su resolución final, y todas las partes deberán tener una oportunidad razonable de presentar toda materia pertinente a tal moción bajo dicha regla.

La citada regla establece los fundamentos para que una parte en un pleito pueda solicitar la desestimación de una demanda en su contra, mediante la presentación de una moción fundamentada en cualesquiera de los motivos en ella expuestos. *El Día, Inc. v. Mun. de Guaynabo*, 187 DPR 811, 820-821 (2013); *Asoc. Fotoperiodistas v. Rivera Schatz*, 180 DPR 920, 935 (2011). En particular, la Regla 10.2(5) de las de Procedimiento Civil, *supra*, dispone que el demandado puede fundamentar su solicitud en que la demanda no expone "una reclamación que justifique la concesión de un remedio". En tales casos, la desestimación solicitada se dirige a los méritos de la controversia y no a los aspectos procesales. *Montañez v. Hosp. Metropolitano*, 157 DPR 96 (2002).

En fin, la desestimación de la reclamación judicial procede cuando surja de los hechos bien alegados en la demanda que la parte demandante no tiene derecho a remedio alguno. *Torres, Torres v. Torres et al.*, 179 DPR 481, 501 (2010). Para alcanzar dicha conclusión, es necesario que el tribunal considere ciertas todas las alegaciones fácticas que hayan sido aseveradas de manera clara en la demanda. *Rivera Sanfeliz et al. v. Jta. Dir. First Bank*, 193 DPR

38, 49 (2015); *Colón v. Lotería*, 167 DPR 625, 649 (2006). La razón de ser de dicho requisito es que el demandante no viene obligado a realizar alegaciones minuciosas y técnicamente perfectas, sino que se le permite limitarse a bosquejar a grandes rasgos su reclamación, mediante una exposición sucinta y sencilla de los hechos. *Sánchez v. Aut. de Los Puertos*, 153 DPR 559, 569 (2001).

Así, el Tribunal Supremo de Puerto Rico ha expresado en diversas ocasiones que, ante una moción de desestimación, las alegaciones hechas en la demanda hay que interpretarlas conjuntamente, liberalmente y de la manera más favorable posible para la parte demandante. *Colón v. Lotería*, supra, a la pág. 649; *Dorante v. Wrangler of P.R.*, 145 DPR 408, 414 (1998).

**Discreción del Tribunal de Primera Instancia**

Se ha señalado que los tribunales de primera instancia gozan de amplio margen de discreción para llevar a cabo los procedimientos que presiden, por lo que sus decisiones merecen gran deferencia. *Citibank et al. v. ACBI et al.*, 200 DPR 724, 735 (2018). Esa discreción se ha definido como "el poder para decidir en una u otra forma, esto es, para escoger entre uno o varios cursos de acción". *García v. Padró*, supra, pág. 334; *Pueblo v. Ortega Santiago*, 125 DPR 203, 211 (1990).

En consecuencia, los tribunales apelativos —salvo contadas excepciones— no debemos intervenir con la forma en que los foros primarios manejen sus casos. Véase, *Citibank et al. v. ACBI et al.*, supra, pág. 736; además, *Ramos Milano v. Wal-Mart*, 168 DPR 112, 121 (2006). Por eso, se ha señalado que aquellas determinaciones que un tribunal inferior haga en el sano ejercicio de su discreción, "deben ser respetadas por los foros apelativos, a menos, claro está, que se demuestre arbitrariedad, un craso abuso de discreción, una determinación errónea que cause grave perjuicio a una de las partes, o la necesidad de un cambio de política procesal o sustantiva".

*Citibank et al. v. ACBI et al.*, supra*; Ramos Milano v. Wal-Mart*, supra*;*

*Rebollo López v. Gil Bonar*, 148 DPR 673, 678 (1999).

Sobre este particular, nuestro Tribunal Supremo ha expresado que un foro judicial incurre en abuso de discreción:

> [...] cuando el juez no toma en cuenta e ignora en la decisión que emite, sin fundamento para ello, un hecho material importante que no podía ser pasado por alto; cuando el juez, por el contrario, sin justificación ni fundamento alguno, concede gran peso y valor a un hecho irrelevante e inmaterial y basa su decisión exclusivamente en este, o cuando, no obstante considerar y tomar en cuenta todos los hechos materiales e importantes y descartar los irrelevantes, el juez los sopesa y calibra livianamente. (citas omitidas) *Pueblo v. Rivera Santiago*, supra, pág. 580.

**Difamación**

La Constitución de Puerto Rico y la Constitución Federal garantizan el derecho a la libertad de expresión y de prensa. Art. II, sec. 4, Const. ELA, LPRA, Tomo 1, ed. 2016. Esta constituye una de las libertades más apreciadas contenidas en ambas constituciones. *Torres Figueroa v. Vélez Rivera y otros*, 210 DPR 665, 679, (2022) (Opinión de conformidad de la Jueza presidenta Oronoz Rodríguez). Asimismo, el Tribunal Supremo de los Estados Unidos ha expresado, en cuando a la Primera Enmienda de la Constitución Federal que: "[w]hatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discursion of governmental affairs". *Landmark Communications, Inc. v. Virginia*, 435 US 829, 838 (1978).

Además de lo anterior, nuestra Constitución garantiza el derecho a la intimidad y a la "protección de ley contra ataques abusivos a su honra, a su reputación y a su vida privada o familiar". Art. II, sec. 8, Const. ELA, LPRA, Tomo 1, ed. 2016, pág. 324. Esto como corolario a la máxima constitucional que dicta que la "dignidad del ser humano es inviolable". Art. II, sec. 1, Const. ELA, *supra*, pág. 275.

Las acciones de difamación plantean la necesidad de balancear el derecho a la libre expresión y la libertad de prensa, que comprende el interés del pueblo en fomentar el debate vigoroso sobre cuestiones de interés público, y el derecho a la intimidad de los individuos. *Gómez Márquez et al. v. El Oriental*, 203 DPR 783, 795 (2020), citando a *Maldonado y Negrón v. Marrero y Blanco*, 121 DPR 705, 713 (1988); *González Martínez v. López*, 118 DPR 190, 192 (1987).

En nuestra jurisdicción existen dos causas de acción en daños por difamación, es decir, la establecida en la Ley de Libelo y Calumnia de Puerto Rico de 1902, 32 LPRA sec. 3141 *et seq.*, y la derivada del Artículo 1802 del Código Civil de 1930, ahora Artículo 1536 del Código Civil de 2020, 31 LPRA sec. 10801. Sobre la Ley de Libelo y Calumnia, es necesario señalar que la misma codificó rasgos básicos del *common-law*. *Colón, Ramírez v. Televicentro de P.R.*, 175 DPR 690, 701 (2009). Sin embargo, el Tribunal Supremo de Puerto Rico ha expresado que "... dicha dicotomía [entre la Ley de Libelo y Calumnia y el Artículo 1802] parece ser ya innecesaria, habida cuenta que jurisprudencialmente se han dejado sin efecto diversas disposiciones de la Ley de Libelo y Calumnia". *Ojeda v. El Vocero de P.R.*, 137 DPR 315, 326, (1994). Asimismo, el Alto Foro ha señalado que la Ley de Libelo y Calumnia de Puerto Rico, *supra*, ha perdido gran parte de su importancia tras la aprobación de nuestra Constitución en el 1952. *Colón, Ramírez v. Televicentro de P.R.,* supra, pág. 713.

Como norma general, los casos relacionados con este tema se deben resolver según la normativa de los daños y perjuicios extracontractuales. *Íd.* Añade el Tribunal Supremo que debemos acudir a nuestro derecho para sopesar los intereses involucrados en los casos por difamación. Esto debido a que Puerto Rico tiene facultad para establecer sus normas de responsabilidad civil

extracontractual en casos de difamación "siempre que no se imponga una responsabilidad absoluta, ni se reduzca el contenido de la Primera Enmienda de la Constitución federal." (cita omitida) *Íd.*, pág. 713.

Asimismo, el Tribunal Supremo de Puerto Rico ha expresado que, "[e]n este campo, la jurisprudencia norteamericana tiene solamente carácter ilustrativo o persuasivo, salvo las limitaciones impuestas por la Constitución federal y a la jurisprudencia interpretativa del Tribunal Supremo de Estados Unidos". *Íd.,* pág. 709; R. Serrano Geyls, *Derecho Constitucional de Estados Unidos y Puerto Rico*, Universidad Interamericana de Puerto Rico, 2013, Vol. II, pág. 1348.

Por su parte, la difamación ha sido definida como la expresión falsa que constituye un ataque al honor, dignidad y reputación de una persona. Una expresión difamatoria puede ocurrir mediante el libelo o la calumnia. El libelo se conoce como la difamación maliciosa que se realiza contra una persona por cualquier medio escrito de comunicación, que tienda a exponerle a ser desacreditada, deshonrada o menospreciada. C. J. Irizarry Yunqué, *Responsabilidad Civil Extracontractual: un estudio basado en las decisiones del Tribunal Supremo de Puerto Rico*, 7ma ed., San Juan, pág. 151. La calumnia, por su parte, trata de una expresión difamatoria. *Íd.*

En una acción por difamación, el objeto de derecho es la reputación personal del sujeto injuriado públicamente, o sea, se trata del derecho de este último a defender su nombre ante los ojos de los demás, en el interés de: (1) proteger las relaciones que sostiene con terceros; (2) proteger la probabilidad de relaciones futuras con terceros; (3) proteger su imagen pública en general, y (4) evitar que se le cree una imagen pública negativa si careciere de reconocimiento público en el presente. *Soc. de*

*Gananciales v. El Vocero de P.R.*, 135 DPR 122, 126-127 (1994). Cuando quien comparece en una causa de acción por difamación es una persona privada, solo es necesario que se demuestre negligencia. *Torres Silva v. El Mundo, Inc.,* 106 DPR 415 (1977).

La negligencia se ha definido como la falta del debido cuidado, que a la vez consiste en no anticipar y prever las consecuencias racionales de un acto, o de la omisión de un acto, que una persona prudente habría de prever en las mismas circunstancias. *Colón, Ramírez v. Televicentro P.R.*, supra; *Ramos v. Carlo,* 85 DPR 353, 358 (1962).

Los criterios que debe utilizar un tribunal para determinar, en una acción específica de difamación, si la persona demandada incurrió en negligencia al hacer la publicación alegadamente libelosa son: (1) la naturaleza de la información publicada y la importancia del asunto sobre el cual trata, especialmente si la información es libelosa de su faz y puede preverse el riesgo de daño; (2) el origen de la información y la confiabilidad de su fuente; (3) la razonabilidad del cotejo de la veracidad de la información, lo cual se determina tomando en consideración el costo en términos de dinero, tiempo, personal, la urgencia de la publicación, el carácter de la noticia y cualquier otro factor pertinente. *Colón, Ramírez v. Televicentro* P.R., supra, pág. 708, citando a *Torres Silva v. El Mundo, Inc.*, supra.

**Privilegio del reporte justo y verdadero**

En casos por difamación, la verdad es objeto de defensa. Asimismo, existen otras defensas que dependen de la persona responsable de la publicación y la condición de esta. *Irizarry Yunqué, op cit.*, págs. 151-152. Una de estas defensas es la comunicación privilegiada. El Tribunal Supremo ha expresado que "[u]na comunicación privilegiada es aquella que, a no ser por la ocasión o las circunstancias, sería difamatoria y sujeta a reclamación".

*Villanueva v. Hernández Class*, 128 DPR 618, 646 (1991), que cita a *Díaz v. P.R. Rv., Lt. & P. Co.*, 63 DPR 808, 811 (1944). Para el profesor José Julián Álvarez, se trata de una figura que proviene del *common-law*, cuya única función consiste en "establecer las circunstancias en las que no se impondrá responsabilidad, aun cuando el demandante haya sufrido daños". J. J. Álvarez González, *Derecho Constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos*, Bogotá, Ed. TEMIS, 2009, pág. 1024. *Véase también*, J. J. Álvarez González, *Derecho Constitucional*, 61 Rev. Jur. UPR 637, 765 (1992).

La Sección 4 de la Ley de Libelo y Calumnia, 32 LPRA sec. 3144, establece diversos tipos de comunicaciones privilegiadas. En lo pertinente, dispone que:

> No se tendrá por maliciosa, ni como tal se considerará la publicación que se hace en un procedimiento legislativo, judicial, u otro procedimiento cualquiera autorizado por la ley. No se presumirá que es maliciosa la publicación que se hace:
>
> Primero. (...)
>
> Segundo. En un informe justo y verdadero de un procedimiento judicial, legislativo u oficial, u otro procedimiento cualquiera, o de algo dicho en el curso de dichos procedimientos.
>
> Tercero. (...).

El privilegio condicional del reporte o informe justo y verdadero aplica a las recopilaciones de lo allí ocurrido que se hacen para el beneficio de la ciudadanía a través de los medios. *Meléndez Vega v. El Vocero de PR*, 189 DPR 123, 201 (2013). Este privilegio se asienta en la idea de que el reportero actúa como sustituto del público en la observación de un evento. *Villanueva v. Hernández Class*, supra, pág. 648.

Son dos los requisitos que deben estar presentes para que se pueda configurar el privilegio del reporte justo y verdadero. En primer lugar, el reportaje tiene que ser justo en relación con el proceso que es objeto de información. *Villanueva v. Hernández*

*Class*, supra, pág. 647. El reporte es justo si captura la sustancia de lo acontecido y si toma en consideración el probable efecto que tendrá su publicación en la mente de un lector y oyente promedio. *Íd.*

El segundo elemento del privilegio consiste en que lo publicado tiene que ser cierto y reflejar la verdad de lo expresado o acontecido en el procedimiento llevado a cabo; ello aún cuando la información que se brinda en el procedimiento judicial, legislativo u oficial sea falsa o libelosa. *Íd.* Para que se cumpla con el elemento de la veracidad de lo relatado, no es necesario que lo publicado sea exactamente "correcto", sino que bastará con que se publique un extracto sustancialmente correcto de lo ocurrido. *Íd.*

Por otra parte, si bien es cierto que este privilegio ha sido reconocido como uno de los más importantes para la protección de la prensa contra ataques de libelo, *Villanueva v. Hernández Class*, supra, pág. 649, no es menos cierto que su aplicabilidad es restringida. *Meléndez Vega v. El Vocero de PR*, supra, pág. 202. Es decir, si se redacta un relato parcializado y subjetivo de lo ocurrido en los procedimientos y, se prueba que el demandado publicó la información maliciosamente con ánimo prevenido, con el fin de causar daño, o con conocimiento de la falsedad de la información, el privilegio no aplica. *Íd.*

Según la nota al calce Núm. 23, de la decisión de *Villanueva y. Hernández Class*, supra, en algunas jurisdicciones, una vez se ha cumplido el examen de lo que constituye lo justo y verdadero, **se considera que el privilegio cierra las puertas y no se examinan los motivos, si algunos, que pudo tener el publicador, ni tampoco su actitud hacia la veracidad de la declaración**. En otras, el privilegio puede ser levantado solo cuando las declaraciones difamatorias están basadas claramente en informes oficiales y no se extienden a declaraciones que el lector pueda entender provienen de

otras fuentes. Aún en otras, el privilegio cubre los reportes y anuncios oficiales realizados por oficiales públicos en su capacidad como tales, mas no las publicaciones derivadas de declaraciones no oficiales.

Agregamos que en *Villanueva v. Hernández Class*, supra, el Tribunal Supremo ha explicado los alcances del referido privilegio:

> [E]l "privilegio del reporte justo y verdadero", existente en nuestro ordenamiento desde principios de siglo [XX], protege inclusive a quien publica una información falsa o difamatoria, siempre que la misma recoja o refleje verazmente lo acontecido en los procedimientos, informes o acciones públicas u oficiales de agencias gubernamentales. *Íd.*, pág. 648.

> Los informes realizados en torno a hechos de carácter delictivo también están protegidos por el mencionado privilegio, toda vez que existe un claro interés público en la administración de la justicia. *Id.*, pág. 648, nota al calce 20. El propósito de lo anterior es permitir que los reporteros o periodistas actúen como sustitutos del pueblo en la observación de los eventos de importancia para el país en general. *Íd.*, pág. 648. En palabras del Tribunal Supremo, se trata de "la protección más importante que se ofrece a la prensa en materia de libelo". *Íd.*, pág. 649.

A pesar de que en nuestra jurisdicción el privilegio del reporte justo y verdadero tiene su existencia desde principios del siglo XX, se ha trasado el inicio de este al 1796 en las cortes inglesas. Kyu Ho Youm, *Fair Report Privilege as a Libel Defense: Status for Foreign*, 3 (1) Univ. of Florida J. L. P. P 29, 31 (1990). Es desde ese momento que las cortes en Inglaterra comenzaron a reconocer el rol de la prensa para informar con precisión sobre procedimientos judiciales en los tribunales. *Íd.* Posteriormente, el privilegio fue extendido a otros procedimientos, como reportes y debates parlamentarios. *Íd.* También, se aprobó legislación para extender el privilegio a procedimientos no gubernamentales. *Íd.*

De otro lado, según el profesor Kyu Ho Youm, en los Estados Unidos la aplicación del reporte justo y verdadero se aplicó de forma más liberal en comparación con las cortes de Inglaterra. *Íd.* Por tanto, se extendió a procedimientos que no habían sido aplicados por los ingleses. *Íd.* Sin embargo, no existe uniformidad en cuanto a

la aplicación de este privilegio. Algunas jurisdicciones abordan la defensa desde la legislación, otras desde el *common law*. D. L. Hudson, *The First Amendment: Freedom of Speech*, sec. 5:8 (Octubre, 2012). Asimismo, en algunas jurisdicciones existe legislación que exclusivamente aplica el privilegio a la prensa, mientras que existe legislación que no hace la distinción entre personas privadas y la prensa. Ho Youm, *supra*, 36. Compárese N.J. Stat. Ann. sec. 2A:43-1 (West); Ariz. Rev. Stat. Ann. sec. 12-653; Ga. Code Ann. sec. 51-5-7 (West); Mont. Code Ann. sec. 27-1-804 (West); N.D. Cent. Code Ann. sec. 14-02-05 (West).

Sobre el abordaje del privilegio desde la legislación o desde el *common-law*, nos comenta el profesor Rodney A. Smolla que: "[t]hus, while the fair report privilege is a venerable common-law doctrine, **it is a doctrine that clearly partakes of First Amendment values, and it has been suggested that the privilege (in some form) should perhaps be understood as required by modern First Amendment principles**." (Énfasis suplido). R. A. Smolla, Law *of Defamation* sec. 8:67 (2d ed., 2023). Asimismo, añade el profesor Smolla que:

> the great landmark decisions in First Amendment history, the Supreme Court in *New York Times Co. v. Sullivan* held that traditional common law tort rules governing libel were inconsistent with many core free speech values, and had to be modified to be brought into conformity with the requirements of the First Amendment. In the years since *New York Times*, the Supreme Court has frequently revisited the area, defining the contours of First Amendment limitations on libel, invasion of privacy, and related torts.
>
> It is worth noting that while the *New York Times* decision dealt largely with the fault standards that apply to defamation law, in its aftermath **courts have frequently held that other common-law or statutory defamation doctrines may also reflect First Amendment values, and may indeed come to be understood as required by First Amendment principles**. **A good example is the traditional defamation "fair report" privilege which protects fair and accurate reporting of judicial proceedings. It has been suggested that the fair reports privilege may be required by the First Amendment." (Citado en por la opinión concurrente** (Citas en el original omitidas). (Énfasis suplido). (Citado en la opinión de conformidad emitida por el Juez Asociado Colón Pérez a la cual se le unió el Juez Asociado Estrella Martínez en el caso *Torres, Santana v.*

*Noticentro PR et al.*, 210 DPR 783, 829 (2022)). *Véase* 3 R. A. Smolla, *Smolla & Nimmer on Freedom of Speech,* sec. 23:1 (Abril, 2022).

Respecto a la controversia sobre si el privilegio puede ser invocada por ciudadanos particulares, no existe legislación federal ni jurisprudencia del Tribunal Supremo de los Estados Unidos que señale que el privilegio se extiende a las personas privadas, más allá de la prensa. En Puerto Rico, tampoco contamos con legislación ni jurisprudencia que haga expresa la aplicación del privilegio a personas que no son miembros de la prensa. Sin embargo, para el profesor Pedro Malavet Vega este privilegio puede invocarse por cualquier persona en nuestra Isla. P. Malavet Vega, *Derechos y Libertades Constitucionales en Puerto Rico*, Ponce, Ed. Lorena, 2003, pág. 251.

A pesar de lo anterior, el Tribunal Supremo de Puerto Rico se ha expresado en cuanto a la protección de la libertad de prensa y su aplicación a la ciudadanía. Nuestro más Alto Foro ha interpretado que: "... **la libertad de expresión brinda a la ciudadanía en general la misma protección que la ofrecida por la libertad de prensa a los medios de comunicación.**" *Colón, Ramírez v. Televicentro de P.R.*, supra, pág. 708. De igual manera, en el caso de *Olivera v. Paniagua,* nuestro más Alto Foro ha interpretado que:

> **El reconocimiento de unos derechos a la prensa inexorablemente conlleva extender iguales derechos y privilegios a la ciudadanía en particular vía la cláusula sobre libertad de expresión**. En el desarrollo de una sociedad democrática ambas caminan juntas de la mano. En última instancia el valor que late en el fondo de la cuestión es de singular jerarquía. **'Lo que se debe proteger no es la institución en sí, sino la labor de la prensa: viabilizar un vehículo de información y opinión, informar y educar al público, ofrecer críticas, proveer un foro para la discusión y el debate, y actuar como un sustituto para obtener noticias e información para sus lectores, que por sí y como individuos no pueden o desean compilarla. Una garantía especial de la libertad de prensa deberá aplicar no solamente a aquellos que la corte podía clasificar como prensa' sino a quien quiera, de cualquier tamaño, y cualquier medio, que regularmente asuma la misión de la prensa.** (Citas omitidas) (Énfasis nuestro) *Oliveras v. Paniagua Diez,* 115 DPR 257, 268, (1984).

Por su parte, para el profesor Jorge M. Farinacci, "[e]l hecho de que la Sección 4 [del Artículo II de nuestra constitución] utiliza **la frase *libertad de prensa*, a diferencia de la 'libertad de expresión', apunta a que se trata de un derecho general de palabra escrita y no un derecho particular de los medios noticioso**s". (Énfasis nuestro) J. M. Farrinacci Fernós, *La Carta de Derechos*, San Juan, Ed. Universidad Interamericana de Puerto Rico, 1ra ed., 2021, pág. 88. Añade, además, que "[l]o anterior es confirmado por el historial legislativo. Específicamente, **se vincula la libertad de prensa a la 'difusión escrita'**. En esa dirección, la libertad de palabra se refiere principalmente a expresiones orales, mientras que la libertad de prensa se refiere a expresiones escritas". (Énfasis nuestro). *Íd.*

**Doctrina de la Hipérbole retórica**

La doctrina de "hipérbole retórica" fue adoptada por nuestro Tribunal Supremo en el caso de *Garib Bazain v. Clavell*, 135 DPR 475 (1994). Esta derrota una acción por difamación cuando el balance de intereses se inclina hacia la protección del derecho a la libertad de expresión y de la prensa.

Según la doctrina, hipérbole retórica constituye "...una expresión alegadamente difamatoria que no es accionable si se utiliza en sentido figurativo, flexible y no necesariamente por su significado literal". *Aso. Med. Pediátrica v. Romero*, 157 DPR 240, 246 (2002). Esto, lo que significa es que la doctrina pretende proteger expresiones que no pueden ser interpretadas razonablemente como que expresan hechos reales. *Garib Bazain v. Clavell*, supra. Además, la opinión constituye una expresión "...relativa a cuestiones de interés público que no contenga una connotación fáctica que sea susceptible de ser probada como falsa...". *Íd.,* pág. 489.

**III.**

En esencia, el peticionario señaló que el TPI erró al no desestimar la demanda en su contra debido a que, aun tomando como ciertos los hechos bien alegados en esta, las expresiones que se le atribuyen están protegidas por el privilegio del reporte justo y verdadero, así como por la doctrina de hipérbole retórica.

Como cuestión de umbral, precisa advertir que la determinación recurrida es un asunto comprendido dentro de las materias que podemos revisar de conformidad con la Regla 52.1 de las de Procedimiento Civil, *supra*, al constituir un dictamen resolutorio de una moción de carácter dispositivo. Asimismo, a la luz de las disposiciones de la Regla 40 de nuestro Reglamento, *supra*, entendemos que están presentes algunos de los criterios allí dispuestos para que proceda nuestra intervención con la misma. Este Tribunal se encuentra ante una controversia novel. Esto pues, estamos en posición de adoptar una defensa a una persona privada que solo ha sido aplicada a la prensa y los medios noticiosos del país.[1]

El señor Negrón Torres argumenta que parte de sus expresiones se limitan a describir el contenido de las alegaciones de una Querella presentada contra Bottles, y que estas fueron realizadas en calidad de portavoz de la organización Justicia Salarial. Por esta razón, arguye que sus expresiones están protegidas por el privilegio del reporte justo y verdadero. Por su parte, Bottles afirma que el privilegio del reporte justo y verdadero no es de aplicación al caso ante nuestra consideración debido a que el peticionario es una persona privada que realizó las expresiones desde sus cuentas privadas en las

---

[1] Aclaramos que este Tribunal expide y atiende el caso conforme a nuestro Reglamento, por lo que no estamos de acuerdo con la posición de la parte recurrida en cuanto a que el caso se ha tornado académico debido a la alegación responsiva que presentó el peticionario. Como tribunal intermedio, estamos en posición de resolver el asunto ante nuestra consideración, aunque los procedimientos hayan continuado en el tribunal de primera instancia. Enfatizamos, además, que no se solicitó la paralización de los procesos ante el TPI ni esta Curia *motu proprio* hizo tal determinación. Asimismo, conforme más adelante se discutirá, la determinación de este tribunal dispone del caso en su totalidad en el foro revisado.

redes sociales. Señala, además, que no surge de las expresiones realizadas que él sea portavoz del grupo Justicia Salarial. También expresa que, aún si fuera portavoz de Justicia Salarial, en nada cambia la ecuación del caso, es decir, la no aplicación del privilegio. Por tanto, según Bottles, el privilegio solo se extiende a periodistas y a medios noticiosos, no a personas privadas. Para sustentar su argumento, Bottles cita en su escrito una decisión del Tribunal Federal para el Distrito de Florida[2] en donde dicha corte determinó que el privilegió del reporte justo y verdadero no se aplica a las personas privadas.

Huelga decir que las interpretaciones de otras jurisdicciones en materia de difamación son meramente persuasivas salvo las impuestas por la Constitución federal y la jurisprudencia del Tribunal Supremo de Estados Unidos. *Colón, Ramírez v. Televicentro de P.R.*, supra.

Al momento de esta decisión, y de nuestra investigación jurídica, debemos advertir que la controversia planteada por las partes no ha sido interpretada por el Tribunal Supremo Federal. No obstante, la parte recurrida pretende persuadirnos con un caso del Tribunal Federal para el Distrito de Florida, el cual no abona a nuestra interpretación jurisprudencial sobre el derecho a la libertad de prensa y a la libertad de expresión bajo nuestra Constitución. Incluso, como bien señalamos anteriormente, existen jurisdicciones en donde se ha aplicado el privilegio a personas que no pertenecen a la prensa. Ejemplo de esto es el caso *Sahara Gaming Corp. v. Culinary Workers Union Loc. 226*, 115 Nev. 212 (1999), donde la Corte Suprema de Nevada aplicó el privilegio a una unión laboral.

Si acogiéramos la interpretación del caso del Tribunal Federal para el Distrito de Florida, citado por la recurrida, estaríamos

---

[2] *Grayson v. No Labels, Inc.*, No. 620CV1824ORL40LRH, 2021 WL 2869870, at *1 (M.D. Fla. Jan. 26, 2021).

restringiendo el derecho a la libertad de prensa consagrado en nuestra Constitución. **Así pues, precisa puntualizar que nuestro más Alto Foro ha resuelto que los derechos y privilegios de la prensa se extiende a la ciudadanía en particular**. *Íd.*; *Olivera v. Paniagua*, supra. De igual forma, lo han entendido los profesores Farinacci Fernós y Malavet Vega.

Acorde con lo expresado anteriormente, entendemos que el privilegio del reporte justo y verdadero puede ser invocado por una persona privada como defensa en nuestra jurisdicción. Por tanto, en este caso, el señor Negrón Torres, como individuo privado o como portavoz del grupo Justicia Salarial, puede invocar la defensa del reporte justo y verdadero. Al final, debemos recordar lo expresado por nuestro Tribunal Supremo:

> 'Lo que se debe proteger no es la institución en sí, sino la labor de la prensa: viabilizar un vehículo de información y opinión, informar y educar al público, ofrecer críticas, proveer un foro para la discusión y el debate, y actuar como un sustituto para obtener noticias e información para sus lectores, que por sí y como individuos no pueden o desean compilarla. **Una garantía especial de la libertad de prensa deberá aplicar no solamente a aquellos que la corte podía clasificar como prensa' sino a quien quiera, de cualquier tamaño, y cualquier medio, que regularmente asuma la misión de la prensa.** (Citas omitidas) (Énfasis nuestro) *Oliveras v. Paniagua Diez*, supra, pág. 268.

Como indicamos, para que prevalezca la defensa del privilegio justo y verdadero se tiene que cumplir con dos requisitos. Primero, el reporte tiene que ser justo en cuanto al objeto de información. En otras palabras, debe captar lo acontecido y tomar en consideración el probable efecto que su presentación tendrá en la mente de un lector y oyente promedio. Segundo, lo publicado tiene que ser cierto y reflejar, de manera sustancial, lo verdaderamente expresado o acontecido en el procedimiento llevado a cabo. Nótese que el privilegio alberga, incluso, la difusión de una expresión falsa y difamatoria, si esta es relatada justa y verdaderamente. Además, no es necesario que lo publicado sea exactamente "correcto".

De una lectura del expediente surge que las expresiones vertidas por el peticionario contra Bottles están contenidas en la Querella presentada en el caso GB2023CV00268[3]. Tan es así que el peticionario hace referencia en sus publicaciones a la Querella presentada contra la recurrida.[4] A modo de ejemplo, el señor Negrón Torres realizó expresiones en su cuenta personal de la red social *Twitter* (Ahora X), donde señaló que: "BOTTLES no paga NADA de salario a las meseras y meseros; están como 'servicios profesionales'. Estas personas tienen derecho a un sub-salario bajo de $2.13, pero BOTTLES se esconde detrás de la PROPINA para no pagar nada. Deben más de 30k en salarios".[5] Por su parte, la Querella presentada contra Bottles contiene las siguientes alegaciones: "Según el patrono, la relación obrero patronal, iba a ser configurada bajo la figura del Contratista Independiente y por tal razón la querellada no le pagó el sub-salario fijado por la Ley Federal de Normas Razonables de Trabajo de 1938".[6] Se menciona también en la Querella que: "El querellante trabajó por espacio de 7 meses y su salario fue uno a base de comisión (no recibió salario directo del patrono) y sus ingresos ascendían a $850 semanales sin incluir el pago de sub-salario mínimo por hora al cual tiene derecho, sin embargo, patrono incumplió con la obligación legal de pagar un sub-salario mínimo de $2.13 por hora".[7] Añade la Querella: "Que el patrono mantiene un sistema en el cual le incluye a cada mesa un cargo obligatorio por servicio de 18% pero en realidad se trata de una propina escondida, sin embargo, la querellada se queda con la mitad de la cifra a pesar de que por ley la totalidad de dicha cuantía le corresponde al empleado".[8]

---

[3] Este Tribunal tomó conocimiento judicial del caso citado y surge que la parte querellada es Bottles, Kindred Spirits Inc., y Richard Gonsalves.

[4] Apéndice parte peticionaria, Anejo 2, a la pág. 7. (Señala el peticionario en su cuenta personal de *Twitter* que: "*Escuchadas algunas declaraciones sobre la Querella contra Bottles aclaramos que, de una lectura simple del doc., se desprende que patrono no está pagando $2.13 por hora.*").

[5] *Íd.*, a la pág. 4

[6] *Íd.*, Anejo 6, a la pág. 45.

[7] *Íd.*

[8] *Íd.*

Por lo que, luego de analizadas la Querella; así como las expresiones vertidas por el peticionario, colegimos que tales expresiones no constituyen una opinión parcializada o subjetiva de los hechos. Más bien, las mismas están sustentadas e incluso, no cabe duda, que son extractos de varias alegaciones incluidas en la referida Querella. Al respecto, debemos recordar que las expresiones no tienen que ser correctas y que, además, una vez se ha cumplido el examen de lo que constituye lo justo y verdadero, se cierran las puertas para examinar los motivos, si algunos, que pudo tener el publicador, ni tampoco su actitud hacia la veracidad de la declaración.

Asimismo, y de lo antes explicado, no podemos ignorar, que en casos por difamación, la verdad es objeto de defensa.

En consecuencia, tomando como ciertas las alegaciones, la defensa del reporte justo y verdadero termina con el pleito instado por la recurrida. Esto, debido a que resulta forzoso colegir que las publicaciones del señor Negrón Torres constituyen un informe justo y verdadero de la Querella instada en contra de la recurrida y, por ende, una comunicación privilegiada, no sujeta a la reclamación judicial instada.

Aún cuando lo antedicho daría fin al caso ante nos, el peticionario alega que solo la expresión, "ESTO ES UN LEGADO DIRECTO DE LA ESCLAVITUD", no está contenida en la Querella presentada contra Bottles. Sin embargo, arguye que la expresión está protegida por la doctrina de hipérbole retórica. Bottles, por su parte, alega que dicha doctrina no es aplicable en este caso debido a que las expresiones se fundamentan en hechos falsos y representaciones engañosas no susceptibles de ser tomadas como mera retórica.

Recordemos que la doctrina de la hipérbole retórica protege únicamente expresiones que no pueden ser interpretadas razonablemente como que divulguen hechos reales. Por otro lado, la

doctrina de opinión protege expresiones relativas a la discusión de temas de interés público que no contengan aseveraciones fácticas que sean susceptibles de ser probadas como falsas.

Así, concurrimos con el señor Negrón Torres cuando expresa en su recurso que "…ninguna persona en su sano juicio leería estas expresiones y pensaría que las personas que trabajan para la parte demandante lo hacen de manera forzada, encadenadas, mientras un amo les supervisa y les agrede físicamente y emocionalmente si no hacen lo que les han ordenado".[9] En este sentido, no nos parece acertado que una persona razonable piense que verdaderamente se está tildando a Bottles de "amo de esclavos", como alega la parte recurrida. Ni menos podemos razonar que la expresión conlleva un hecho real de que los meseros y las meseras son maltratadas como esclavos (as). Más bien, esta expresión, únicamente, hace referencia a como Bottles, conforme a lo alegado en la Querella, realiza la práctica de la propina, costumbre que es habitual en el comercio de comida en Puerto Rico. Además, como surge del expediente, dicha expresión la divulga el peticionario en su carácter de portavoz de Justicia Salarial, por lo que pretende acentuar un asunto que es de interés público conforme con su filosofía. Es decir, se busca resaltar ante la audiencia la discusión sobre los salarios de los meseros y meseras de la Isla.

En virtud de todo lo anterior, recalcamos que aún si tomáramos como ciertas las alegaciones de la demanda, para propósitos de analizar la procedencia de la solicitud de desestimación al amparo de la Regla 10.2 de las de Procedimiento Civil, *supra*, concluimos que no existe una causa de acción a favor de Bottles en contra del peticionario por difamación. Ello, pues, las defensas del reporte justo y verdadero e hipérbole retórica derrotan la pretensión

---

[9] Véase, el Recurso de *certiorari* de la parte peticionaria, a la pág. 13.

de la parte recurrida. Consecuentemente, resolvemos que el foro recurrido incidió al no desestimar la reclamación instada contra el señor Negrón Torres, al amparo de la Regla 10.2 de las de Procedimiento Civil, *supra*.

En fin, el TPI cometió el error señalado.

## IV.

Por los fundamentos antes expuestos, procede expedir el auto de *certiorari* solicitado y revocar la *Resolución* recurrida. En consecuencia, se desestima la demanda instada por Bottles en contra del peticionario.

Notifíquese inmediatamente.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

LCDA. LILIA M. OQUENDO SOLÍS
Secretaria del Tribunal de Apelaciones